UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/5/07

PETER W. LINDNER,

                    Plaintiff,                    06 Civ. 3834 (JGK)

          - against -                             OPINION AND ORDER

AMERICAN EXPRESS CORPORATION and
QING LIN,

                    Defendants.

**JOHN G. KOELTL, District Judge:**

On April 13, 2007, the defendants moved by order to show cause to enforce an alleged oral settlement agreement, purportedly reached by the parties on March 29, 2007 before Magistrate Judge Katz. After hearing argument on the motion on May 4, 2007, the Court denied the motion without prejudice, finding that issues of fact precluded summary enforcement of any alleged settlement agreement and required an evidentiary hearing. However, the Court allowed the parties to provide further submissions on the scope and necessity of any such evidentiary hearing. In these submissions, the parties agree that no evidentiary hearing is necessary and instead urge the Court to resolve the issue based solely on the evidence submitted thus far, which includes the transcript of the alleged oral settlement agreement dated March 29, 2007, upon which both parties principally rely.

1

Because the parties agree that there are no factual disputes that necessitate an evidentiary hearing, the Court will resolve the motion without an evidentiary hearing.  The Court has carefully considered and reviewed the evidence submitted with the motion to enforce the alleged settlement, which is deemed renewed, the documents referenced at oral argument on May 4, 2007, and all other documents referenced in the parties' various submissions.  Based on the particular facts and circumstances of this case, as established by the current record, the defendants have failed to satisfy their burden of showing that a binding agreement exists between the parties.  Therefore, the defendants' motion to enforce the alleged settlement agreement is **denied**.

I.

These parties are no strangers to one another in the courtroom.  Their litigation history dates back to early 2000 when Mr. Lindner first sued American Express Corporation, his former employer, and Qing Lin, his former supervisor (collectively "American Express"), in the New York State courts for sexual harassment in violation of Title VII and, in a separate action, for defamation.  (Am. Compl. ¶ 9.)  In June 2000, the parties settled these lawsuits pursuant to a

2

Settlement Agreement and General Release.  (Am. Compl. ¶ 10 and Ex. 1.)

This diversity action arises from an alleged breach of that June 2000 settlement agreement by American Express.  In his amended complaint, Mr. Lindner alleges that American Express breached the settlement agreement when defendant Qing Lin made certain allegedly defamatory remarks about Mr. Lindner to a prospective employer, contrary to the terms of the agreement. (See Am. Compl. ¶¶ 11-12, 14-17, 23, and 34.)  Mr. Lindner further alleges that Qing Lin made these remarks in retaliation for Mr. Lindner's previously filed sexual harassment suit, in violation of Title VII of the Civil Rights Act of 1964.  (Am. Compl. ¶¶ 28-29.)  Mr. Lindner asserts three causes of action: (1) a claim for breach of contract; (2) a Title VII retaliation claim; and (3) a claim for slander.

On March 29, 2007, the parties met with Magistrate Judge Katz to discuss settlement.  After a full day of mediation, the parties convened in Judge Katz's courtroom, where Judge Katz announced that the parties had "worked out the terms of an agreement, which we're going to put on the record now."  (See Transcript, Mar. 29, 2007, at 2 ("Tr."), attached as Ex. B to Affirmation of Jean Y. Park, Apr. 13, 2007 ("Park Aff.").) Judge Katz added:  "It's going to be embodied in a writing that I expect to be executed sometime next week."  (Tr. at 2.)  Jean

Park, counsel for the defendants, agreed to draft the document
and send it to plaintiff's counsel, Thomas Luz.  Then, Ms. Park-
-with occasional input from others--proceeded to outline the
"material terms" of the agreement on the record.  Ms. Park
stated that the agreement "will include" the issuance of a
settlement payment to Mr. Lindner, including attorney's fees,
noting that "to the extent that Mr. Lindner would like,"
American Express was "amenable to issuing a separate check" to
Mr. Lindner's attorney.  (Tr. at 2.)  She said that American
Express "would want" a stipulation of discontinuance, to be
filed within ten days of Mr. Luz receiving a signed agreement
and settlement payments from American Express, in exchange for
which American Express "would like some standard clauses," which
she went on to list in varying degrees of detail.  (Tr. at 2-3.)

     Some of the terms Ms. Park announced were quite precise;
for example, the parties worked out the exact language of
various letters that American Express would write for Mr.
Lindner.  (See Tr. at 3-7.)  Some of the terms were not so
precise.  As to a list of employees that American Express would
direct not to disclose information about Mr. Lindner's
employment, Ms. Park noted that "we didn't finalize that."  (Tr.
at 8.)  Moreover, when Judge Katz asked whether there was
"[a]nything else," Mr. Lindner's counsel replied:  "Just that
the terms that were discussed on the record, or the language

4

used, may be modified by the attorneys in writing." (Tr. at
10.)   Ms. Park then referred to a cease-and-desist and a
standstill provision, and Judge Katz stated: "There's some
detail they need to get from people who aren't here today, but
that will be worked out with the attorneys." (Tr. at 10-11.)
Ms. Park responded: "But the letters as read into the record,
those are final." (Tr. at 11.)

Finally, when asked whether the agreement would be
confidential, Ms. Park stated: "Yes. There would be--all the
other standard terms and conditions of the agreement would be--I
guess of the prior agreement." (Tr. at 11.) After reciting
some of these "standard terms and conditions," she went on: "We
would want a no-further consideration provision and choice of
law provision, State of New York, and--," at which point she was
cut-off by Mr. Luz. (Tr. at 11.) She never finished her
comment about the standard terms and conditions. There was a
brief suggestion that the confidentiality term might be omitted,
but the defendants rejected the possibility. (Tr. at 11-12.)
When Judge Katz asked for the last time whether there was
anything else, Mr. Lindner's counsel responded that there was
not, but again noted that "we'll work out the language in the
agreement" and then, after counsel conferred off the record, Mr.
Lindner's counsel stated on the record: "Why don't we see what
you draft, and if there's anybody we think of, we'll add to the

list." (Tr. at 12.) The proceeding concluded with Judge Katz
asking Mr. Lindner whether the terms as so stated were
acceptable to him, to which he replied "yes" but noted his
unhappiness. (Tr. at 12-13.) Judge Katz then confirmed: "So
you're agreeing to this?" And Mr. Lindner answered: "Yes, I
am." A representative of American Express then agreed to the
terms as set forth. Judge Katz concluded by saying that this
Court "should expect, hopefully, a stipulation by the end of
next week." (Tr. at 13.) He then instructed the parties: "And
let me know if there's any issues, okay?" (Tr. at 13.)

    The issues began to surface the next morning. On Friday
morning, March 30, 2007, Mr. Lindner contacted the Corporate
Secretary of American Express to state that he was not going to
"go through" with the settlement. (Park Aff. ¶ 14.) Around
April 3, 2007, Mr. Lindner agreed to comply with the terms of
the settlement pending his motion to vacate the settlement.
(Park Aff. ¶¶ 21-22 and Ex. D.) On April 6, 2007, Mr. Lindner
submitted a letter to this Court, stating that "[u]pon further
reflection and in consultation with another attorney, I have
decided to abide by the terms of settlement set forth before
Judge Katz on Mar. 29, 2007." (Park Aff. Ex. F.) However, on
April 10, 2007, Mr. Lindner sent another letter advising the
Court that his April 6, 2007 letter was not a reversal of his
decision to "stop the agreement." (See Reply Affirmation of

Jean Y. Park, May 2, 2007 ("Park Reply Aff."), Ex. C.)  Rather,
according to Mr. Lindner's letter, he merely intended to advise
the Court that he was obeying the "agreement" pending further
instruction from the Court.  The defendants filed their motion
to enforce the alleged settlement agreement on April 13, 2007.
Because of the plaintiff's refusal to go forward with the
agreement, Mr. Luz moved to withdraw as plaintiff's counsel, and
the Court granted Mr. Luz's motion.  (See Order dated Apr. 18,
2007.)  Mr. Lindner appears now by special substitute counsel.

## II.

A district court has the power, and indeed the duty, to
enforce summarily, on motion, a settlement agreement reached in
a case pending before it.  See Meetings & Expositions, Inc. v.
Tandy Corp., 490 F.2d 714, 717 (2d Cir. 1974) (collecting
cases); Transtech Electronics Pte Ltd. v. NAS Electronics, Inc.,
No. 98 Civ. 1209 (JGK), 2000 WL 381428, at *2 (S.D.N.Y. Apr. 13,
2000); Vari-O-Matic Machine Corp. v. New York Sewing Machine
Attachment Corp., 629 F. Supp. 257, 258 (S.D.N.Y. 1986).

The issue presented on this motion is whether the parties
intended to enter into a final, binding oral contract at the
settlement conference with Magistrate Judge Katz on March 29,
2007, or whether the parties instead intended to be bound only
after the agreement was memorialized in a fully executed,

written document.[1]  As the parties agree, the two leading cases

guiding this determination are Winston v. Mediafare

Entertainment Corp., 777 F.2d 78 (2d Cir. 1985) and Ciaramella

v. Reader's Digest Association, Inc., 131 F.3d 320 (2d Cir.

1997).  The parties' intent is critical in determining when a

contract is formed.  Winston, 777 F.2d at 80.  The parties have

the "freedom to determine the exact point at which an agreement

becomes binding, a party can negotiate candidly, secure in the

knowledge that he will not be bound until execution of what both

parties consider to be a final document."  Id. (emphasis added).

Parties may freely decide to enter into a final and binding

contract orally, even if the parties contemplate the creation of

a later writing as evidence of the agreement.  Id.; see, e.g.,

Doi v. Halekulani Corp., 276 F.3d 1131, 1134 (9th Cir. 2002);

Francis v. Home Box Office, Inc., No. 04 Civ. 7430, 2005 WL

1020863 (S.D.N.Y. Apr. 28, 2005); Alvarez v. City of New York,

---

[1] This case was originally removed from state court pursuant to
28 U.S.C. § 1441, and the Court has jurisdiction of this matter
pursuant to 28 U.S.C. §§ 1331 and 1367.  The Second Circuit Court of
Appeals has declined to decide whether federal or state common law
determines whether the parties have reached a settlement of claims
involving both federal and state causes of action, finding no material
difference between federal and New York State law on the issue.  See
Ciaramella v. Reader's Digest Assoc., Inc., 131 F.3d 320, 322 (2d Cir.
1997).  In practice, both the Court of Appeals for the Second Circuit
and district courts have applied the highly developed New York State
law of contracts to determine the validity of alleged settlement
agreements allegedly entered into in this state, and the Court will do
so in this case.  See id; McNamara v. Tourneau, Inc., 464 F. Supp. 2d
232, 236-37 (S.D.N.Y. 2006); see also Omega Engineering, Inc. v.
Omega, S.A., 432 F.3d 437, 443 (2d Cir. 2005) ("A settlement agreement
is a contract that is interpreted according to general principles of
contract law.").

146 F. Supp. 2d 327 (S.D.N.Y. 2001); Pretzel Time, Inc. v.

Pretzel Int'l, Inc., No. 98 Civ. 1544, 2000 WL 1510077 (S.D.N.Y.

Oct. 10, 2000). On the other hand, if a party intends not to be

bound until an agreement is memorialized in a fully executed

document, "no amount of negotiation or oral agreement to

specific terms will result in the formation of a binding

contract." Winston, 777 F.2d at 80; see, e.g., Gildea v. Design

Distributors, Inc., 378 F. Supp. 2d 158 (E.D.N.Y. 2005);

Elements/Jill Schwartz, Inc. v. Gloriosa Co., No. 01 Civ. 904,

2002 WL 57260 (S.D.N.Y. Jan. 15, 2002); Turk v. Chase Manhattan

Bank USA, N.A., No. 00 Civ. 1573, 2001 WL 736814 (S.D.N.Y. June

11, 2001). The parties' intent may be discerned from the

parties' words and deeds, "which constitute objective signs in a

given set of circumstances." Winston, 777 F.2d at 80.

In Winston, and again in Ciaramella, the Court of Appeals

outlined the following four factors to assist courts in

determining whether parties to an alleged oral agreement intend

to be bound in the absence of a fully executed document:

> (1) whether there has been express reservation of the
> right not to be bound in the absence of a writing; (2)
> whether there has been partial performance of the
> contract; (3) whether all of the terms of the alleged
> contract have been agreed upon; and (4) whether the
> agreement at issue is the type of contract that is
> usually committed to writing.

Winston, 777 F.2d at 80; see also Ciaramella, 131 F.3d at 323.

Although no single factor is dispositive, each factor offers

significant guidance. Ciaramella, 131 F.3d at 323. These factors must be considered in light of the entire context of the case, always bearing in mind that the parties' intent ultimately controls. See Winston, 777 F.2d at 81. Notably, in both Winston and Ciaramella, based on the facts of those cases, the Court of Appeals found clear error in the district court's determination that a binding oral settlement agreement had been reached.

Finally, under New York law, the proponent of a contract, in this case American Express, has the burden of proving the existence of a contract by a preponderance of the evidence. See First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998); Commerce Funding Corp. v. Comprehensive Habilitation Services, Inc., No. 01 Civ. 3796, 2005 WL 447377, at *8 (S.D.N.Y. Feb. 24, 2005).

### III.

For the reasons that follow, the Court finds that American Express has not satisfied its burden of proving by a preponderance of the evidence that both parties intended to be bound by an oral agreement in the absence of a fully executed document.

10

A.

Because--as explained below--the third Winston factor,
whether all of the terms of the contract had been agreed to and
there was nothing left to negotiate, sheds light on the first
Winston factor, whether there was an express reservation not to
be bound, the Court begins by analyzing this third factor.

In Winston, the district court concluded that all of the
changes in the agreement "related only to language" and were not
"of any substance."  777 F.2d at 82.  The Second Circuit Court
of Appeals, however, explained that even where any changes or
disagreements are "minor or technical," the fact that the
parties reach an oral agreement on all of the remaining terms
does not necessarily mean that the parties were bound prior to
the minor modifications.  Id.  Rather, the Court of Appeals
stated that "the actual drafting of a written instrument will
frequently reveal points of disagreement, ambiguity, or omission
which must be worked out prior to execution.  Details that are
unnoticed or passed by in oral discussion will be pinned down
when the understanding is reduced to writing."  Id. (quoting
R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 75 (2d Cir.
1984) (alterations omitted)); see, e.g., Ciaramella, 131 F.3d at
325 (finding that substantive terms remained to be negotiated
where a draft letter of reference that the defendant agreed to
send differed from what the plaintiff expected).

11

In this case, at the time of the March 29 conference with
Judge Katz, the parties had not reached a final agreement on all
of the terms of the settlement.  Certain terms of the settlement
were final, for example, the language to be used in the various
letters that American Express agreed to write for Mr. Lindner.
Other terms, however, were not finalized.  Regarding a list of
employees who American Express would direct not to disclose
information about the plaintiff, Ms. Park noted "we didn't
finalize that."  (Tr. at 8.)  In addition, plaintiff's counsel,
Mr. Luz, twice repeated that he reserved the right to modify the
language of the agreement.  After Mr. Luz's first reservation,
Ms. Park referenced some specific provisions, and Judge Katz
noted that there were still some details that needed to be
obtained from persons not present.  As Winston instructs, even
if these points can be considered minor or technical, they are
sufficient to foreclose a finding that a final agreement on all
the terms had been reached.

Moreover, apart from these terms, other terms of the
proposed settlement would have inevitably emerged as significant
points of disagreement and ambiguity during the drafting of the
written agreement.  The parties discussed that the final
agreement would contain "all the other standard terms and
conditions" of the prior agreement, but did not purport to list
all such terms, much less draft them.  (See Tr. at 11.)  The

12

parties here never proceeded to the drafting stage of the
negotiations.  Mr. Lindner expressed his desire not to "go
through" with the settlement the morning after the conference,
before any draft was produced.  However, as part of their motion
to enforce the settlement agreement, the defendants submitted a
proposed order to the Court titled "Proposed Order Dismissing
Action and Enforcing Settlement Terms," which--according to Ms.
Park's affidavit--"sets forth the terms of the confidential
settlement."  (See Park Aff. ¶ 28 and Ex. G ("Proposed Order").)
The terms of the alleged agreement, incorporated in this
proposed order, highlight points of disagreement between the
parties on material terms.

     Given the plaintiff's desire to repudiate the settlement
and avoid going forward with any agreement, a critical
disagreement would have arisen--as it has in the papers--over
whether a seven-day revocation clause was or would be included
as one of the "standard terms and conditions" of the prior
agreement.  The June 2000 agreement included a clause--nestled
between a choice of law provision and a provision stating that
Mr. Lindner understood and had conferred with counsel about the
agreement--providing Mr. Lindner with twenty-one days to review
the agreement upon receiving it and another seven days after
signing the agreement to revoke it.  (Am. Compl. Ex. 1 ("June
2000 Agreement"), at ¶ 20.)  Mr. Lindner argues that this term

13

was to be included as a standard term and condition of the prior

agreement, and the defendants disagree.  This point of ambiguity

would have inevitably created a serious--and in all likelihood

fatal--disagreement between the parties during the drafting

phase.  If the terms were included, Mr. Lindner could have done

precisely what he sought to do--refuse to go through with the

settlement agreement after it was allegedly agreed to at the

conference.

There are also more subtle indicia in the transcript that

the terms of the settlement agreement were not final.  Ms.

Park's language in describing the terms of the settlement

agreement is often conditional, discussing what the agreement

"would" include and what the defendants "would want."  Such

conditional language is a far cry from the language occasionally

used in on-the-record stipulations, which parties may seek in

lieu of a written settlement agreement, where the parties

announce that they "stipulate and agree" to various terms and

the record is clear that both sides intend the stipulation to be

final and binding immediately.  In addition, Mr. Luz's statement

near the end of the conference about waiting to see what the

defendants "draft" (Tr. at 12) further suggests that the on-the-

record discussion was not intended to embody the final terms of

an agreement to which the parties intended to be bound

immediately, nor did Judge Kats'z invitation to the parties to

14

let him know if there were any "issues" in working out the

stipulation (Tr. at 13).[2]

Finally, the defendants inserted a liquidated damages

provision, enforceable against Mr. Lindner, as a term of the

alleged oral agreement. Based on the transcript, this term was

not mentioned at the March 29 conference. The defendants'

inclusion of the term provides further evidence that the terms

of the agreement had not been fully finalized and resolved.[3]

Therefore, based on these considerations and the facts on

this record, the Court cannot conclude that the parties entered

into a final binding oral agreement "satisfactory in every

---

[2] The Court affords little weight to the statements in Mr. Luz's
affidavit in support of his motion to withdraw that the parties
reached an oral settlement agreement at the March 29 conference and
comprehensive resolution of all the issues between the parties.  (See
Aff. of Thomas J. Luz, Apr. 3, 2007, at ¶¶ 4 and 7, attached to Park
Reply Aff. at Ex. B.)  First, there is no indication that Mr. Luz's
statements were based on the applicable Second Circuit case law
regarding oral settlement agreements, and his statement that the on-
the-record settlement constituted a comprehensive resolution of all
issues between the parties is inconsistent with the transcript.
Moreover, the Court notes that this is not the first time that counsel
for a party has withdrawn after a party refused to go through with an
alleged settlement agreement.  Other courts have declined to enforce
alleged settlement agreements despite counsel's withdrawal.  See,
e.g., Ciaramella, 131 F.3d at 321; Grupo Sistemas Integrales de
Telecomunicacion S.A. de C.V. v. AT&T Comm'ns, Inc., No. 92 Civ. 7862,
1994 WL 463014, at *2 (S.D.N.Y. Aug. 24, 1994).

[3] Of course if the Court found that there was a binding oral
agreement, the next step would be to determine what the terms of that
agreement were.  At that second step, the liquidated damages
provision, if not a part of such an agreement, would be excised.
However, before reaching that step, it is probative of the issue of
whether all of the terms had been negotiated and resolved to note that
the defendants inserted a significant clause in a proposed order to
the Court, which defense counsel represented "sets forth the terms of
the confidential settlement" (Park Aff. ¶ 28), but which is not fairly
supported by the transcript.

15

respect to both sides." See Winston, 777 F.2d at 81. Serious
issues remained to be negotiated and resolved before the
agreement could be finalized. This factor thus weighs strongly
against the defendants efforts to establish that the parties
intended to be bound by the oral agreement.

**B.**

The issue under the first Winston factor is whether either
party expressly reserved the right not to be bound prior to the
execution of a written document. Although this factor is
phrased in terms of "express" reservations, courts--including
the court in Winston--also analyze whether the particular facts
and circumstances of the case--such as the nature of the
negotiations or the language of any draft agreements--
demonstrate an implied reservation of the right not to be bound
until the execution of a written agreement. See, e.g., Winston,
777 F.2d at 81 (stating that although there was no express
reservation of the right not to be bound, "language in the
correspondence does reveal such an intent"); Grupo Sistemas,
1994 WL 463014, at *3 n.2.

Because parties are free to enter into a binding oral
settlement agreement even if they contemplate subsequently
memorializing their oral agreement in writing, the mere fact
that the parties contemplate a later writing is insufficient to

16

establish an intent not to be bound until that time.  See
Winston, 777 F.2d at 80; see also Ciaramella, 131 F.3d at 322.
However, the inclusion in a draft settlement agreement of such
terms as a merger clause or a revocation clause may be "a strong
indication that the parties did not intend to be bound until the
final written settlement agreement was executed."  Cruz v.
Onesource Facility Serv., Inc., No. 03 Civ. 8233, 2005 WL
2923517, at *2 (S.D.N.Y. Nov. 4, 2005); see also Ciaramella, 131
F.3d at 324.

In this case, the March 29 transcript does not reveal any
express reservation of the right not to be bound until the
execution of a final written document.  However, the record
contains evidence of an implied reservation of that right.
First, on two occasions, Mr. Luz--plaintiff's counsel--stated on
the record that he reserved the right to modify the language of
any written agreement.  (See Tr. at 10, 12.)  Implicit in the
reservation of the right to modify the language of the agreement
is the reservation of the right not to be bound until all of the
terms of the agreement, including any minor or technical
details, are fully resolved.

Second, the defendants' proposed order, which purports to
incorporate the terms of the oral agreement reached between the
parties, includes a merger clause, which provides that "[t]his
Settlement, along with the June 2000 Settlement Agreement and

17

General Release between Lindner and the Company, which is
incorporated by reference herein, constitutes the entire
agreement between the parties with respect to the subject
matters hereof and supersedes any and all prior oral and written
agreements and understandings..." (Proposed Order ¶ 14.) The
presence of this merger clause, which the defendants represent
to be a term of the agreement between the parties, is
"persuasive evidence that the parties did not intend to be bound
prior to the execution of a written agreement." See Ciaramella,
131 F.3d at 324.

Third, as discussed above, there is a serious question as
to whether the parties intended to include a revocation clause
as a "standard term and condition" from the June 2000 settlement
agreement. The revocation clause in the June 2000 agreement
provided that "Mr. Lindner is further advised that he has 7 days
after he signs this agreement to revoke it by notifying the
company's Employment Law Group in writing." (See June 2000
Agreement ¶ 20.) As Judge Preska explained, discussing a
similar seven-day revocation clause: "Parties to an enforceable
agreement would clearly not include such a clause in a proposed
settlement." Cruz, 2005 WL 2923517, at *2.

The defendants argue that the revocation clause is not a
standard contract term. The defendants point out that such
language is required to effect a knowing and enforceable waiver

18

of age discrimination claims under the Age Discrimination in

Employment Act ("ADEA"). See McNamara v. Tourneau, Inc., 464 F.

Supp. 2d 232, 238-39 (S.D.N.Y. 2006) (discussing the ADEA waiver

requirements in the context of a motion to enforce an alleged

settlement agreement). The defendants then attempt to

distinguish this action from the plaintiff's past action against

the defendants by arguing that the past action involved the

resolution of employment discrimination claims against the

defendants.[4]

The defendants' argument is unpersuasive. The issue is not

whether the revocation clause is standard language in a contract

generally, but whether it was a standard term of the prior

agreement. (Tr. at 11.) The placement of that clause near the

end of the agreement, amidst other clauses dealing with issues

such as choice of law and an acknowledgement of the plaintiff's

opportunity to confer with counsel, suggests that it was a

standard term of the prior agreement. Moreover, the defendants

do not contend that the plaintiff's prior lawsuit involved any

ADEA claims that required the inclusion of an ADEA waiver

provision. Instead, the defendants rely on the fact that the

prior lawsuit involved "employment discrimination" claims. This

action, however, includes a claim for retaliation in violation

---

[4] The defendants' proposed order incorporated the June 2000
agreement by reference, arguably including the revocation clause.
(Proposed Order ¶ 14.)

of Title VII for the plaintiff's having reported allegedly
discriminatory practices and having filed the prior lawsuit. As
far as the purported rationale for including an ADEA waiver is
concerned, there is no material difference between the
plaintiff's present claim for Title VII retaliation and his
prior claim for Title VII discrimination.

The strong argument for including a revocation clause as a
term and condition of the June 2000 agreement that was
incorporated in the alleged oral agreement between the parties
thus favors a finding that the parties did not intend to be
bound until they signed a fully executed written agreement.

Finally, the defendants rely on the fact that Mr. Lindner
stated on the record to Judge Katz that he agreed to the
"terms." (Tr. at 12-13.) However, given the prior reservations
by counsel as to the language of the agreement, the
contemplation of a written agreement, and the ambiguity
surrounding the standard terms and conditions to be incorporated
from the June 2000 agreement, it cannot be said that Mr.
Lindner's statement that he agreed to the "terms"--without more-
-indicated that the plaintiff intended to be bound at that
moment. See, e.g., Ciaramella, 131 F.3d at 321 (finding no
settlement agreement despite the representation of plaintiff's
counsel to defendant's counsel: "We have a deal."); Grupo
Sistemas, 1994 WL 463014, at *1 (same).

If the defendants intended to establish the existence of a binding oral agreement at the March 29 conference, they should have requested that Judge Katz inquire more fully into the nature of Mr. Lindner's agreement, intent, and understanding, for example, inquiring whether Mr. Lindner understood that by agreeing to the terms of the agreement he was entering into a binding and enforceable agreement at the moment, and also that, by agreeing, his lawsuit would be dismissed and he would have no trial. See, e.g., Lopez v. City of New York, 242 F. Supp. 2d 392, 392-93 (S.D.N.Y. 2003); (Ellis, Mag. J.) (stating that "the Court interrogated the parties under oath to confirm their understanding and acceptance of the terms of the settlement agreement"); Shabtai v. Honeywell, Inc., No. 94 Civ. 0524, 1998 WL 823617, at *2 (S.D.N.Y. Nov. 25, 1998) (Ellis, Mag. J.) (finding that the parties agreed to settle a case where the "plaintiff stated, under oath, that she understood the principal terms of the agreement, and promised not to return to argue this case" and where the defendant's representative stated on the record "I regard this now as an enforceable agreement" to which the plaintiff responded "Yes, it's enforceable.").

On balance, the first Winston factor favors the plaintiff.

**C.**

The second Winston factor, partial performance, is not particularly probative on the facts of this case because the plaintiff repudiated any alleged agreement almost immediately; thus the parties never had an opportunity to evidence an oral agreement on the basis of partial performance. See Hostcentric Tech., Inc. v. Republic Thunderbolt, LLC, No. 04 Civ. 1621, 2005 WL 1377853, at *8 (S.D.N.Y. June 9, 2006) (Peck, Mag. J.) (finding this factor neutral where one party repudiated the agreement prior to the other party's obligation to perform).

**D.**

The final Winston factor is whether the agreement at issue is the sort of contract that ordinarily would be reduced to writing. See Winston, 777 F.2d at 83. "Settlements of any claim are generally required to be in writing or, at a minimum, made on the record in open court." Ciaramella, 131 F.3d at 326; see also N.Y. C.P.L.R. § 2104. This alleged oral agreement apparently satisfies the minimum requirement stated in Ciaramella, that it be stated on the record in open court, although there is some question about whether this was actually an open court agreement, given the defendants' efforts to seal the transcript of the settlement conference and given the nature of the settlement conference. (See Order of Mag. J. Katz, Apr.

19, 2007, at 4-5 ("Because this Court was only participating in
the action in order to assist the parties with their settlement
efforts, and it was made clear that all settlement discussions
were 'off the record,' for all practical purposes the settlement
conference was not a 'court proceeding' as to which the public
has a right of access.").)

In any event, this agreement is of the sort that would
ordinarily be expected to go beyond the minimum requirement
stated in Ciaramella and be reduced to writing. Based on the
litigation history of these parties, one would expect the
parties to reduce any settlement agreement to writing. The
parties settled a prior lawsuit with a written settlement
agreement. One of the primary claims asserted in the present
lawsuit was for breach of a settlement agreement. As such, the
wisdom of Winston--"prudence strongly suggests that their
agreement be written in order to make it readily enforceable,
and to avoid still further litigation," 777 F.2d at 82--applies
with full force to the facts of this case. See Ciaramella, 131
F.3d at 326.

Moreover, the settlement agreement is relatively complex.
See Ciaramella, 131 F.3d at 326. The agreement provided for
American Express to provide the plaintiff with several letters
containing precise language. In turn, the plaintiff agreed to
take various steps related to his activities as a shareholder of

23

American Express.  Like the agreement in Ciaramella, the
plaintiff here agreed to avoid future employment with American
Express, agreed not to disparage American Express publicly, and
agreed not to disclose the terms of the settlement agreement.
Id.  For these reasons, the alleged oral agreement is
sufficiently complex that one would expect such an agreement
ordinarily to be reduced to writing.  This factor, therefore,
weighs in favor of a finding that the parties did not intend to
be bound by an oral agreement.

In sum, based on a consideration of all of the relevant
facts and circumstances of this case and weighing all of the
Winston factors, the Court concludes that the defendants have
failed to establish by a preponderance of the evidence the
existence of a binding oral settlement agreement.

## CONCLUSION

For all of the reasons discussed above, the defendants'
motion to enforce the alleged settlement agreement is **denied**.

**SO ORDERED.**

Dated:    New York, New York
          May  3/ , 2007

                                        John G. Koeltl
                              United States District Judge

24